IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS BARNDT,                      :
                                    :
        Plaintiff,         :   CIVIL NO. 3:CV-05-2666
                                    :
   v.                               :   (Judge Vanaskie)
                                    :
MICHAEL PUCCI,                      :
                                    :
        Defendant.         :

## MEMORANDUM

I. Introduction

    Plaintiff, Thomas Barndt ("Plaintiff" or "Barndt"), a state inmate currently housed at the Dallas State Correctional Institution ("SCI-Dallas"), Dallas, Pennsylvania, commenced this pro se action with a civil rights complaint filed pursuant to the provisions of 42 U.S.C. § 1983. Plaintiff alleges that, on June 22, 2004, Defendant Michael Pucci ("Defendant" or "Pucci"), a corrections officer employed by SCI-Dallas, hit Plaintiff in the face and slammed his face into a wall four to five times while Plaintiff was handcuffed behind his back. (Dkt. Entry 1 at 2, Section IV, ¶ 1.) Plaintiff alleges that Defendant then falsely charged him with assault. (Id.) He asserts an Eighth Amendment claim for excessive use of force and a due process claim with respect to discipline he received for a misconduct charge

resulting from his encounter with Defendant Pucci.  Plaintiff seeks compensatory, punitive, and exemplary damages as well as a transfer to a correctional institution closer to his five grandchildren in Lebanon County.  (Id. at 3.)

Presently pending is Defendant's Motion for Summary Judgment.  (Dkt. Entry 47.)  For the reasons that follow, Defendant's Motion for Summary Judgment will be denied as to the excessive use of force claim, but granted as to the due process claim.

II.   Statement of Facts

On June 22, 2004, as inmates at SCI-Dallas were returning from their morning meal, Pucci and Corrections Officer Ronald Pruitt were monitoring them to ensure that they properly returned to their cells.  (Dkt. Entry 49, Defendant's Statement of Material Facts, ¶ 4; Exh. 1, Pucci Decl., ¶ 7; Exh. 2, Pruitt Decl., ¶ 7.)  When inmates return from their morning meal, they are allowed to bring one piece of fruit from the cafeteria to their cells.  (Dkt. Entry 49, ¶ 5; Exh. 1, ¶ 8 (citing Inmate Handbook, Section H, ¶ 7 g., attached as Exh. A to Exh. 1.))  As the inmates returned to their cells, Pucci and Pruitt performed random checks of the inmates.  (Id., ¶ 6; Exh. 1, ¶ 9; Exh. 2, ¶ 8.)  Department of Corrections Policy DC-ADM 203 provides that every inmate is subject to search at any time and that staff may conduct pat searches in any area of the facility.  (Id., ¶ 7; Exh. 1, ¶ 10 (citing DC-

ADM 203, page 6, Section G, attached as Exh. B to Exh. 1.)) During a search, an inmate is required to remove all items from his or her pockets and place them in a suitable place. The inmate is to stand still with his or her feet apart and arms extended outward, palms upward, and follow the verbal direction of the staff member conducting the search. (Id., ¶ 7; Exh. 1, ¶ 11 (citing Exh. B, page 6, Section G, 1.))

As Barndt returned to his cell, he was wearing a winter coat. (Id., ¶ 8; Exh. 1, ¶ 12.) Pucci contends that he noticed a large container in Barndt's pocket, and therefore asked Barndt to stop at a desk. (Id.; Exh. 1, ¶ 13.) Pruitt also noticed a large bulge in Barndt's pocket. (Id.; Exh. 2, ¶ 10.) Barndt admits that he had an ice cream container containing dry cereal in his left coat pocket. (Dkt. Entry 55, Defendant's Statement of Material Facts, ¶ 8.) Barndt began walking up the steps to his cell, but returned after Pucci again requested that he come back to the desk. (Dkt. Entry 49, ¶ 8, 9; Exh. 1, ¶¶ 15-16; Exh. 2, ¶¶ 11-12; Dkt. Entry 55, ¶ 8.) Barndt contests Pucci's averment that Barndt then yelled "Stop fucking with me." (Dkt. Entry 49, ¶ 9; Exh. 1, ¶ 17; Exh. 2, ¶ 13; Dkt. Entry 55, ¶ 9.) Pucci contends that he told Plaintiff to calm down and asked him what was in his coat, but Barndt continued to scream at Pucci to leave him alone. (Dkt. Entry 49, ¶ 9; Exh. 1, ¶ 18; Exh. 2, ¶ 14.) Pucci then informed Barndt of the rules and regulations and again told him to calm down. (Id., ¶ 10; Exh. 1, ¶ 19.) Barndt denies that Pucci informed him of the

3

rules and regulations. (Dkt. Entry 55, ¶ 10.)

The version of the events that next transpired differ markedly. Pucci's version is as follows:

When Barndt arrived at the desk, Pucci advised him to take off his coat, place it on the desk, and put his hands on the wall near the desk to be searched. (Dkt. Entry 49, ¶ 11; Exh. 1, ¶ 20; Exh. 2, ¶ 15.) Plaintiff put his coat on the desk and yelled, "Why don't you fuck with the blacks?" which prompted Pucci to again tell Plaintiff to calm down and comply with his order. (Id., ¶ 12; Exh. 1, ¶¶ 21-22.) Pucci then told Plaintiff to face the wall and put his hands on the wall to be searched. (Id., ¶ 13; Exh. 1, ¶ 23.) Plaintiff faced the wall and put his hands on it, but as Pucci approached him, he kept turning around, taking his hands off the wall and yelling not to take his stuff; therefore, Pucci directed Plaintiff to remain facing the wall and to keep his hands on the wall. (Id., ¶ 15; Exh. 1, ¶¶ 24, 25.) As Pucci went to search Barndt's coat, Barndt turned and came at Pucci without provocation (Id., Exh. 2, ¶ 18) wildly swinging his hands and arms at Pucci. (Id., ¶ 16; Exh. 1, ¶ 26.) As a result, Pucci took a defensive stance and blocked Plaintiff's strikes. (Id., ¶ 16; Exh. 1, ¶ 27; Exh. 2, ¶ 19.)

At that point, Corrections Officer Pruitt called the Control Center to inform the officers there that Pucci had been assaulted. (Id., ¶ 16; Exh. 1, ¶ 28; Exhibit 2, ¶

4

20.)  Pucci grabbed Barndt's hand and made him stand with his body against the wall, but Barndt continued to struggle.  (Id., ¶ 17; Exh. 1, ¶¶ 29, 30.)  Pruitt then assisted Pucci in handcuffing Barndt with his hands behind his back and held him against the wall until help arrived.  (Id., ¶ 18; Exh. 1, ¶ 31; Exh. 2, ¶ 21.)  A few minutes after Pruitt contacted the Control Center, Lieutenant McClosky and other Corrections Officers arrived to assist.  (Id., ¶ 20; Exh. 1, ¶ 33; Exh. 2, ¶ 23; Exh. 3, McClosky Decl., ¶¶ 10-11.)  McClosky and Corrections Officer Yale escorted Barndt to the SCI-Dallas Infirmary.  (Id., 21; Exh. 1, ¶ 34; Exh. 2, ¶ 24; Exh. 3, ¶ 12.)

In contrast, Barndt sets forth the following version of events:

After Pucci directed Barndt to stop walking to his cell and to return to the desk, Barndt placed the ice cream container on the desk and Pucci remarked that Barndt was "trying to get fucking smart with him," and then told Barndt to put his coat on the desk and hands against the wall.  (Dkt. Entry 55, ¶ 11).  Barndt never yelled or said "Why don't you fuck with the blacks?"  (Id., ¶ 12.)  After Barndt told Pucci that there was just dry cereal in the container, Pucci told him to face the wall.  (Id., ¶ 13.)  Barndt put his hands on the wall and then was handcuffed behind his back.  (Id., 14.)  Barndt did not yell or say not to take his stuff because he already had given Pucci the cereal container and all he had left were a couple of ketchup packets.  (Id., ¶ 15.)  Barndt did not swing his arms and fists wildly or in any other way.  (Id., ¶ 16.)  Barndt

5

already was handcuffed when Pucci slammed his head against the wall. (Id.) After Pucci slammed Barndt's head against the wall, Barndt turned his head and saw Officer Pruitt making a phone call to the Control Center. (Id.)

The facts submitted by each party surrounding Barndt's treatment in the infirmary also differ considerably. Pucci's version of the facts is as follows:

At the SCI-Dallas Infirmary, Registered Nurse Scott Thomas examined Plaintiff. (Dkt. Entry 49, 23; Exh. 3, ¶ 14; Exh. 4, Thomas Decl., ¶ 7.) During the examination, Thomas noticed that Barndt had a small "pea-sized" abrasion on his right cheek that was bleeding slightly. (Id., Exh. 4, ¶¶ 7, 8.) Barndt denied having any other injuries, and Thomas did not note any. (Id.. Exh. 4, ¶ 9.) Barndt was very hostile to Thomas during the examination, refused to have his vital signs taken, and denied experiencing any pain. (Id., Exh. 4, ¶¶ 10, 12.) Thomas treated Barndt's abrasion by cleansing it with peroxide and water followed by Betadine and left the abrasion open to the air without bandaging it. (Id., Exh. 4, ¶ 11.) Barndt left the infirmary without assistance. (Id., Exh. 4, ¶ 13.)

In contrast, Barndt sets forth the following version of events with respect to his treatment in the infirmary:

Upon his arrival at the infirmary, the first thing Nurse Thomas did was wipe the blood from Barndt's face before taking a picture of him. (Dkt. Entry 55, ¶ 23.)

Barndt agrees that he had an abrasion, but he also had a nosebleed. (Id., 24.) Barndt was moving around because he did not want Thomas to wipe the blood from his face. (Id., ¶ 26.) He does not recall telling Thomas that he was in pain, but he did tell a physician's assistant and doctor in the Restricted Housing Unit ("RHU") that he was in pain. (Id.)

Pucci contends that, when Barndt swung his arms and hands at Pucci, he may have cut Pucci's right wrist, and therefore Pucci went to Wilkes-Barre General Hospital to have the wound treated and was discharged the same day. (Dkt. Entry 49, ¶ 31, Exh. 1, ¶ 37.) Barndt denies swinging his arms and hands at Pucci and cutting Pucci's wrist. (Dkt. Entry 55, ¶ 31.)

Pucci avers that the use of force was necessary to protect himself and to have Barndt comply with the rules and regulations of the institution. (Dkt. Entry 49, ¶ 33; Exhibit 1, ¶ 40.) He further asserts that he utilized the least amount of force necessary to subdue Plaintiff in accordance with Department of Corrections' ("DOC") Policy DC-ADM-201, which governs the use of force by Corrections Officers in performing their job duties. (Id., ¶¶ 32-33; Exh. 1, ¶¶ 38-41 (citing DOC Policy DC-ADM-201, attached to Exh. 1 as Exh. G); Exh. 2, ¶ 26.) Pruitt never observed Pucci striking Barndt. (Id., ¶ 34; Exh. 2, ¶ 25.)

Barndt denies that the use of force was necessary because he states that he

7

was hand cuffed behind his back when the force was used.  (Dkt. Entry 55, ¶ 32.) Barndt also denies yelling, agitating, provoking, or assaulting Pucci; instead, claims Barndt, Pucci was angry with him for some reason.  (Id., ¶ 33.)  Moreover, Barndt admits that Pruitt stated that he never observed Pucci striking Barndt.  However, he points out that Pruitt did not state that he did not observe Pucci slamming Barndt's head into the wall.  (Id., ¶ 34.)

A DC-141 misconduct was written against Barndt for assaulting Pucci.  (Dkt. Entry 49, ¶¶ 30, 39; Exh. 1, ¶ 35 (citing Misconduct Report, attached to Exh. 1 as Exh. C.))  Barndt was found guilty of the misconduct and sent to the Level 5 RHU. (Id., Exh. 1, ¶ 36 (citing Disciplinary Hearing Report, attached to Exh. 1 as Exh. D.))

In addition, State Police Trooper James Packer investigated the June 22, 2004 incident and filed a Criminal Complaint against Barndt.  (Id., ¶ 35.)  In the complaint, Trooper Packer accused Barndt of Aggravated Assault on the basis that he attempted to cause or intentionally or knowingly caused bodily injury to Pucci when Barndt became agitated and swung his arms and fist wildly toward Pucci in violation of Section 2702(a)(3) of the Pennsylvania Crimes Code.  (Id. (citing Police Criminal Complaint at 2, ¶ 2, attached as Exh. 5.))  Trooper Packer also accused Barndt of Simple Assault on the basis that he attempted to cause or intentionally, knowingly or recklessly caused bodily injury to Pucci in violation of Section

2701(a)(1) of the Pennsylvania Crimes Code. (Id.; Exh. 5 at 2, ¶ 2.) Finally, Trooper Packer accused Plaintiff of Harassment on the basis that he struck, shoved, kicked or otherwise subjected Pucci to physical contact in violation of Section 2709(a)(1) of the Pennsylvania Crimes Code. (Id.)

Trooper Packer also filed an Affidavit of Probable Cause. (Id., ¶ 36 (citing Police Criminal Complaint, Affidavit of Probable Cause, attached as Exh. 6.)) The Luzerne County District Attorney then charged Barndt with Simple Assault and Harassment. (Id., ¶ 37 (citing Indictment, attached as Exh. 7.)) Following a trial, a jury found Barndt guilty of Harassment, but not guilty of Simple Assault. (Id., ¶ 38 (citing Jury Verdict, attached as Exh. 8.))

III.   Standard of Review

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). In considering a summary judgment motion, inferences from the underlying facts must be viewed in the light most favorable to the non-moving party. P.N. v. Clementon Bd. Of Educ., 442 F.3d 848, 852 (3d Cir. 2006).

Rule 56(c) imposes a burden on the moving party to point to an absence of evidence supporting the nonmoving party's case. Celotex Corp. v. Caltrett, 477 U.S.

317, 325 (1986). Once the moving party has met this burden, the burden shifts to the non-moving party. The party opposing summary judgment "may not rely merely on allegations or denials in its own pleading." FED. R. CIV. P. 56(e)(2); Saldana, 260 F.3d at 232. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. Id. Even so, "all that is required [by Rule 56(e)(2)] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Further, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Id. at 255.

IV.   Discussion

    A.   Barndt's Excessive Force Claim.

The use of excessive force against prisoners may constitute cruel and unusual punishment. Hudson v. McMillian, 503 U.S. 1, 5 (1992). Even though a plaintiff need not allege a serious injury to state a claim, the Eighth Amendment does not protect against reasonable uses of force. Id. at 7, 9-10. "[T]here is no constitutional violation for 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" Brooks v. Kyler, 204 F.3d 102, 107 (3d Cir. 2000) (quoting Hudson, 503 U.S. at 9-10). The "use of wanton, unnecessary force resulting in severe pain," however, is actionable. Id. at 109.

In an excessive force claim, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. In evaluating a claim of excessive use of force, the court must take several factors into consideration, such as:

> (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of

11

> injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them' and (5) 'any efforts made to temper the severity of a forceful response.'

Brooks, 204 F.3d at 106 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).

Here, Plaintiff alleges that he did not swing his hands and arms wildly at Pucci. Rather, he alleges that, after Pucci already had handcuffed him behind his back, he slammed Plaintiff's head into the wall three to four times. Plaintiff asserts that he sustained a bloody nose and suffered pain as a result of his injury while he was housed in the RHU. (Dkt. Entry 1 at 3; Dkt. Entry 55, ¶¶ 23, 24, 26; Dkt. Entry 53, Plaintiff's Opposition Brief to Defendants' Motion for Summary Judgment, 1.) In accepting these allegations as true, and in drawing all reasonable inferences in favor of Plaintiff, it is apparent that Plaintiff has established that there is a genuine issue of material fact as to whether Pucci's application of force was applied in an attempt to restore discipline, or maliciously and sadistically to cause Plaintiff pain. See Hudson, 503 U.S. at 7. Because this Court cannot determine the credibility of either party's statements at this stage in order to resolve that issue of fact, Defendant's Motion for Summary Judgment (Dkt. Entry 47) will be denied as to Plaintiff's excessive force claim. See Liberty Lobby, Inc., 477 U.S. at 249, 255.

    B.    Barndt's Due Process Claim.

Defendant also argues that he is entitled to summary judgment because

12

Plaintiff has failed to establish that his Fourteenth Amendment right to due process was violated when he received a misconduct charging him with assault, he was found guilty of the misconduct, and he was placed in the Level 5 RHU.

The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists, and if so, the next step is to define what process is mandated to protect it. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000). Prison conditions do not impact a protected liberty interest unless the prison's action impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 483 (1995). Confinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. Id. at 486. "The determination of what is 'atypical and significant' is based upon the range of conditions an inmate would reasonably expect to encounter." McKeithan v. Jones, 212 Fed. Appx. 129, 130 (3d Cir. 2007) (citing Asquith v. Dep't. of Corrections, 186 F.3d 407, 412 (3d Cir. 1999); Griffin v. Vaughn, 112, F.3d 703, 706 & n.2 (3d Cir. 1997)). Finally, an inmate placed in administrative custody pursuant to a legitimate

penological reason could "be required to remain there as long as that need continues." Griffin, 112 F.3d at 709.

In deciding whether a protected liberty interest exists under Sandin, a federal court also considers the duration of the disciplinary confinement and the condition of that confinement in relation to other prison conditions. Mitchell v. Horn, 317 F.3d 523, 532 (3d Cir. 2003) (citing Shoats, 213 F.3d at 144). In this case, after Barndt was found guilty of misconduct, he was sent to the Level 5 RHU for ninety (90) days. (Dkt. Entry 49, ¶ 39.) In a recent case, the Third Circuit Court of Appeals held that, where an inmate failed to allege that he was subjected to atypical conditions during his 930 day sentence to disciplinary confinement, he failed to show a deprivation of a cognizable liberty interest under Sandin. Young v. Beard, 227 Fed. Appx. 138, 2007 WL 824172 (3d Cir. 2007). If a sentence of 930 days in disciplinary confinement does not implicate a liberty interest, then certainly Barndt's sentence of 90 days in disciplinary confinement does not implicate a liberty interest. Therefore, Barndt has failed to demonstrate that he was entitled to due process protections with regard to his disciplinary confinement, and Defendant's Motion for Summary Judgment (Dkt. Entry 47) will be granted as to Plaintiff's due process claim.

V.      Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment

will be denied as to the excessive use of force claim, but granted as to the due process claim.  An appropriate Order follows.

                                                s/ Thomas I. Vanaskie
                                                Thomas I. Vanaskie
                                                United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS BARNDT, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. 3:CV-05-2666 |
| | : | |
| v. | : | (Judge Vanaskie) |
| | : | |
| MICHAEL PUCCI, | : | |
| | : | |
| Defendant. | : | |

ORDER

NOW, THIS 3rd DAY OF MARCH, 2008, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (Dkt. Entry 47) is DENIED in part and GRANTED in part as follows:

1. Defendant's Motion is DENIED as to Plaintiff's excessive use of force claim.

2. Defendant's Motion is GRANTED as to Plaintiff's due process claim.

3. A telephonic scheduling conference shall be held on March 28, 2008, at 10:00 a.m. Counsel for Defendant shall make the arrangements for the call, to be

placed to 570-207-5720.

                                                  s/ Thomas I. Vanaskie
                                                  Thomas I. Vanaskie
                                                  United States District Judge